UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------------X

ESTER LELCHOOK, individually and as personal
representative of the Estate of David Martin Lelchook;
MICHAL LELCHOOK; YAEL LELCHOOK;
ALEXANDER LELCHOOK; and DORIS LELCHOOK,

                Plaintiffs,

          -against-

THE ISLAMIC REPUBLIC OF IRAN; THE CENTRAL
BANK OF THE ISLAMIC REPUBLIC OF IRAN (a/k/a
Bank Markazi Jomhouri Islami Iran); BANK SADERAT
IRAN; and BANK SADERAT, PLC,

                Defendants.

-------------------------------------------------------------------X

Docket No:
___-CV-_____ (_____)

**COMPLAINT**

Jury trial demanded

**COMPLAINT**

      Plaintiffs, by their counsel, complain of the Defendants, and hereby allege for their Complaint as follows:

**INTRODUCTION**

      1.     This is a civil action brought pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333(a) and supplemental causes of action, arising from the terrorist murder of American citizen David Martin Lelchook on August 2, 2006. On that date, David Martin Lelchook was riding his bicycle at Kibbutz Saar in Israel, when he was struck by a rocket fired from Lebanon by the Hezbollah terrorist organization (hereinafter: the "Rocket Attack"). The Rocket Attack was one of

thousands of rocket and missile attacks against civilians in Israel carried out by Hezbollah between July 12 and August 14, 2006 (hereinafter: the "Hezbollah Rocket Barrage").

2.     The plaintiffs in this action are the estate, widow, daughters, brother and mother of David Martin Lelchook.

3.     The defendants provided extensive material support and resources to Hezbollah, that caused, enabled and facilitated the Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein.

## **THE PARTIES**

4.     Plaintiff Ester Lelchook, at all times relevant hereto, is and was the widow and sole heir of United States citizen David Martin Lelchook, and the personal representative of the Estate of David Martin Lelchook. Plaintiff Ester Lelchook brings this action individually and on behalf of the Estate of David Martin Lelchook.

5.     Plaintiff Ester Lelchook is the duly appointed personal representative of the Estate of David Martin Lelchook.

6.     Plaintiff Michal Lelchook, at all times relevant hereto, is and was a United States citizen and the daughter of David Martin Lelchook.

7.     Plaintiff Yael Lelchook, at all times relevant hereto, is and was a United States citizen and the daughter of David Martin Lelchook.

8.     Plaintiff Alexander Lelchook, at all times relevant hereto, is and was a United States citizen and the brother of David Martin Lelchook, and a resident and domiciliary of Acton, Massachusetts.

9.      Plaintiff Doris Lelchook, at all times relevant hereto, is and was a United States citizen and the mother of David Martin Lelchook, and a resident and domiciliary of Newton Upper Falls, Massachusetts.

10.     Defendant The Islamic Republic of Iran ("Iran"), through its political subdivisions, agencies, instrumentalities, officials, employees and agents, including the other defendants herein, provided Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein.

11.     Defendant Iran is a foreign state within the meaning of 28 U.S.C. § 1603, and has been continuously designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)) since 1984.

12.      Defendant The Central Bank of the Islamic Republic of Iran (a/k/a Bank Markazi Jomhouri Islami Iran) ("CBI") is a political subdivision of defendant Iran. As its name suggests CBI is Iran's central bank. The CBI's capital is wholly owned by defendant Iran. The CBI holds the funds belonging to Iran's ministries and government agencies, as well as Iran's foreign currency and gold reserves. Defendant CBI, acting within the scope of its office and agency, along with the other defendants herein, provided Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein.

13.     Defendant Bank Saderat Iran ("BSI") is a bank incorporated in Iran and one of Iran's largest banks with approximately 3,400 offices worldwide. BSI was nationalized in 1979 after the Iranian Revolution. In 2006, at the time of the Hezbollah Rocket Barrage that is the

subject of this action, BSI was wholly owned and controlled by the Iranian government. In fact, BSI continued to be owned and controlled by the government of Iran until as late as 2010, as confirmed by the United States Department of the Treasury in an August 3, 2010 Press Release.

14.     Defendant BSI is and was at all relevant times an agent of defendant Iran. Defendant BSI, acting within the scope of its office and agency, along with the other defendants herein, provided Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein.

15.     Defendant Bank Saderat PLC ("BSPLC") is a bank incorporated in the United Kingdom that is wholly-owned by defendant BSI. Defendant BSPLC, along with the other defendants herein, provided Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein.

## SUBJECT MATTER JURISDICTION

16.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330(a), 1331, 1367 and 1605A(a) and pursuant to 18 U.S.C § 2333(a).

## PERSONAL JURISDICTION

17.     This Court has personal jurisdiction over the defendants because, as explained and elaborated upon herein, their actions caused, enabled and facilitated the Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook, and those same actions were directed by defendants at the United States, intended by defendants to harm the United States, and did in fact cause harm to the United States.

## VENUE

18.      Venue in this federal district is proper under 18 U.S.C. § 2334(a), because plaintiffs Alexander Lelchook and Doris Lelchook are, and at all relevant times were, residents and domiciliaries of the Commonwealth of Massachusetts.

## STATEMENT OF FACTS

### A.      The Islamic Republic of Iran

19.      Since 1979 and during the period relevant to this suit, defendant Iran has continuously been governed by a militant Islamic regime which believes that Islam should be the sole world religion, that all non-Islamic nations and peoples should become Islamic and be destroyed if they refuse to do so, and that the Islamic nations, led by Iran, should rule the world exclusively.

20.      Since 1979 and during the period relevant to this suit Iran has been and remains, as a matter of official policy, extremely hostile to the United States (which Iran terms "the Great Satan") and to its closest ally in the Middle East, the State of Israel (which Iran terms "the Little Satan").

21.      Since 1979 and during the period relevant to this suit it has been the continuous and official policy and goal of Iran:

      a.   To weaken, harm and undermine the United States militarily, economically and politically;

      b.   To bring about and cause the eradication of the State of Israel, the closest ally of the United States in the Middle East, and its replacement with an Islamic state; and

    c.    To bring about and cause the murder and/or expulsion of the Jewish residents of the State of Israel.

22.    The policy and goals described in the previous paragraph are referred to collectively hereinafter as "Iran's Policy and Goals."

23.    Iran is a highly ideological and authoritarian state that does not tolerate dissent and all political subdivisions of the Iranian government, all agencies and instrumentalities of Iran and all corporations controlled or directly or indirectly owned by Iran therefore support, and seek to advance the policies and goals of Iran, including Iran's Policy and Goals. Accordingly, CBI (which is a political subdivision of Iran) BSI (which is an agent of Iran and, at all relevant times is and was controlled and directly owned by Iran) and BSPLC (which is controlled and indirectly owned by Iran as a wholly owned subsidiary of BSI) support and seek to advance Iran's Policy and Goals.

24.    Since 1979 and during the period relevant to this suit, it has been the continuous and official policy of Iran to use terrorism to achieve Iran's Policy and Goals. Specifically, since 1979 and during the period relevant to this suit, it has been the continuous and official policy of Iran to use terrorism (a) to intimidate and influence the United States government and public and thereby to weaken, harm and undermine the United States militarily, economically and politically and (b) to intimidate and influence the Israeli government and public and thereby to bring about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

25.    In order to carry out and achieve Iran's Policy and Goals using terrorism, Iran established the Hezbollah terrorist organization in 1982. Since 1982 and until the present day, Hezbollah has been controlled, funded and operated by Iran. Since 1982 and until the present

day, Iran has used Hezbollah to carry out thousands of terrorist attacks against American and Israeli targets, in which hundreds of innocent victims have been murdered and thousands more maimed.

26.     In 1982 Iran and Hezbollah entered into an agreement, that remains in force until today, pursuant to which Hezbollah undertook to carry out acts of terrorism against American and Israeli targets, and in return Iran undertook to provide Hezbollah with financial and other material support to carry out such terrorist attacks ("Hezbollah Agreement"), including through defendants CBI, BSI and BSPLC. The purpose of the Hezbollah Agreement was and is to achieve Iran's Policy and Goals.

27.     The courts of the United States have issued many decisions finding Iran civilly liable for terrorist attacks carried out by Hezbollah in which U.S. citizens were murdered or harmed. The District Court for the District of Columbia has found that "Hezbollah is an Iranian proxy organization, controlled, funded and operated by Iran … Iran's control over Hezbollah is so far-reaching that [the federal courts have] repeatedly held Iran vicariously liable, under the doctrine of respondeat superior, for actions of Hezbollah." *Stern v. Islamic Republic of Iran*, 271 F.Supp.2d 286, 292 (D.D.C. 2003). Moreover, in a recent case, the District Court for the District of Columbia found that Iran is liable under FSIA § 1605A for the very same Hezbollah Rocket Barrage that is at issue here. *See Kaplan v. Central Bank of Iran*, 55 F. Supp. 3d 189, 197 (D.D.C. 2014) ("With respect to the rocket attacks, the Court finds that Iran assisted Hezbollah….most generally by providing the funds for the assistance…").

**B.     Hezbollah**

28.     The terrorist attacks committed by Hezbollah between 1982 and July 12, 2006, using material support and resources provided by Iran, included, *inter alia*, the following:

d.  The July 19, 1982, kidnapping of American University president David S. Dodge in Beirut.

e.  The April 18, 1983, car bomb attack on the United States Embassy in Beirut in which 63 people were killed.

f.  The October 23, 1983, truck bomb attack on the U.S. Marine barracks in Beirut in which 241 American military personnel were killed.

g.  The September 20, 1984, car bomb attack on the U.S. Embassy annex in Beirut in which two Americans and 22 others were killed.

h.  The March 16, 1984, kidnapping and murder of William Buckley, a CIA operative working at the U.S. Embassy in Beirut.

i.  The April 12, 1984, attack on a restaurant near the U.S. Air Force Base in Torrejon, Spain in which eighteen U.S. servicemen were killed and 83 people injured.

j.  The December 4, 1984, terrorist hijacking of a Kuwait Airlines plane in which four passengers were murdered, including two Americans.

k.  The June 14, 1985, hijacking of TWA Flight 847 in which Robert Stethem, a U.S. Navy diver, was murdered. Other American passengers were held hostage before being released on June 30, 1985.

l.  The February 17, 1988, kidnapping and subsequent murder of U.S. Marine Col. William Higgins.

m.  The March 17, 1992, bombing of the Israeli Embassy in Buenos Aires that killed 29 people and injured over 200.

n.  The July 18, 1994, bombing of the Jewish community center in Buenos Aires that killed 86 people and injured over 200.

o.  The November 28, 1995, bombardment of towns in northern Israel with missiles aimed at Jewish civilians.

p.  The March 30, 1996, bombardment of northern Israeli towns with 28 missiles. A week later, Hezbollah fired 16 additional missiles, injuring 36 Israelis.

q.  The August 19, 1997, bombardment of northern Israel with dozens of missiles aimed at Jewish civilians.

r.  The December 28, 1998, bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

s.  The May 17, 1999 bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

t.  The June 24, 1999, bombardment on northern Israel, killing 2 people.

u.  The April 9, 2002, launching of missiles into northern Israeli towns.

v.  The August 10, 2003, firing of shells that killed a 16-year-old Israeli boy and wounded other Israelis.

29.  Hezbollah has been designated by the United States Government as a Specially Designated Terrorist ("SDT") continuously since 1995, as a Foreign Terrorist Organization ("FTO") continuously since 1997, and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001.

30.  Hezbollah routinely operates within civilian populations, using civilians as human shields and/or deliberately targeting civilians.

31.     Support for Hezbollah, even in the form of funds transfers, "has no legitimate function that the United States recognizes." *Lelchook v. Commerzbank AG*, 2011 WL 4087448 (S.D.N.Y. 2011).

**C.     Iran's Use of Defendant Banks to Further its Policy and Goals**

32.     In order to carry out and achieve Iran's Policy and Goals, Iran utilizes its government owned or controlled banks, including defendants CBI, BSI and BSPLC to provide necessary financing for its terrorist proxies, including Hezbollah.

33.     BSI (along with all other Iranian banks) was nationalized and placed under the control of the Iranian government in 1979 pursuant to the Iranian Revolutionary Constitution of 1979. As the U.S. State Department correctly explained, the Iranian Revolutionary Constitution "established a theocratic republic and declared as its purpose ***the establishment of institutions and a society based on Islamic principles*** and norms." (emphasis added). The U.S. State Department further noted the fact that the Iranian "Constitution ***mandates*** that all large-scale industry, ***including … banking*** … be ***owned publicly*** and ***administered by the state***." (emphasis added).

34.     In this regard, CBI admits on its website that "After the Islamic Revolution of Iran laws and regulations pertaining to money and banking institutions and monetary policy design and implementation were amended ***to reflect the priorities and principles as set out in the Constitution of the Islamic Republic of Iran***." (emphasis added).

35.     The Iranian constitutional "priorities and principles" which govern and guide the conduct of CBI, BSI and BSPLC include, promoting and protecting the sanctity of Islam worldwide, ensuring the continuation of the Islamic Revolution ***at home and abroad*** with the goal of creating a single world community under Islam, rejecting any alignment with "the

hegemonist superpowers," and supporting the "just struggles" of the "oppressed" against "tyrants" in "every corner of the globe."

36.     The Iranian constitutional "priorities and principles" which guide and govern the conduct of CBI, BSI and BSPLC also include Iran's Policy and Goals, and the use and support of terrorism to achieve Iran's Policy and Goals.

37.     CBI does not function in the same manner as central banks in democratic countries that are institutionally designed to be independent from political interference nor is its purpose limited to "regulating" Iranian banks and managing Iran's currency and internal interest rates. Instead, CBI is an alter-ego and instrumentality of the Iranian government which operates in accordance with the "priorities and principles" of the Iranian constitution.

38.     As the Research Division of the Library of Congress has correctly noted: "All [Iranian] state and private banks are ***strictly overseen*** by the Central Bank of Iran."

39.     The ideological mandate and role of CBI, BSI and BSPLC was confirmed by then-President Mahmoud Ahmadinejad in a December 2005 speech at CBI's headquarters in which he stated that the "glory, identity, independence and future progress of the country is greatly dependent on" Iran's banks, emphasizing that the "glory" and "identity" referred to the ideals of the Islamic Revolution.

40.     Accordingly, CBI assists the Iranian government to ensure that BSI and BSPLC adopt, follow and execute the Iranian government's "priorities and principles," and work towards the regimes Policy and Goals described above, which include the provision of banking services to Iran's proxy Hezbollah and other terrorist groups.

41.     Consistent with this, Iran has routinely used CBI and Iranian Banks, including BSI and BSPLC as conduits to finance Hezbollah.

42.     In July 2007, U.S. Undersecretary of the Treasury for Terrorism and Financial Intelligence Levey correctly explained that:

> The [Iranian] regime does use its banks to pursue … its funding of terrorism … we in the United States have taken action against Bank Saderat for its role in funneling money *from the Central Bank of Iran* to terrorist organizations [including] Hezbollah … Iran not only uses its banks for that purpose, but also *its banks engage in deceptive practices in order to engage in that business.*

43.     Levey similarly testified before Congress in 2008, accurately stating that "Iran uses its state-owned banks … for financing terrorism."

44.     The fact that CBI, BSI and BSPLC transferred funds to Hezbollah pursuant to the Policy and Goals of the Iranian government—and in order to realize those goals—is also confirmed in a November 2008 Press Release issued by the United States Department of Treasury, which explained that:

> Iran Uses its Banks to Finance Terrorism.  In a number of cases, Iran has used its state-owned banks to channel funds to terrorist organizations.  Between 2001 and 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts that support acts of violence.

45.     The Department of Treasury has made similar statements in a number of Press Releases since September 2006. In one such Press Release, dated October 2007, the Treasury Department specifically addressed BSI and BSPLC, summarizing the facts that:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London [*i.e.*, BSPLC] to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

46.     The threat of Iranian-sponsored terrorism to the United States and the importance of the role played by defendants BSI and BSPLC in assisting Iran to provide financial support for that terrorism was confirmed, *inter alia*, by Pat O'Brien, Assistant Secretary in the Office of Terrorist Financing and Financial Crimes of the U.S. Department of the Treasury, who testified before the Senate Committee on Banking, Housing, and Urban Affairs on June 22, 2006. Assistant Secretary O'Brien noted the Executive Branch's intention to "draw on all instruments of national power to combat **the very real threat posed by Iran's sponsorship of terrorism**" and accurately explained that:

> At Treasury, we are focused on the support networks, trying to identify and sever the lines of support that fuel terrorist activities. ***Stopping the money flows is particularly challenging in this instance, as Iran draws upon a large network of state-owned banks***.

47.     The U.S. Treasury's Financial Crimes Enforcement Network (FinCEN) has confirmed that the conspiracy and joint-action between Iran, CBI, BSI and BSPLC to provide funding for Hezbollah and other terrorist groups, which has been on-going for decades, was still continuing in full force as of 2008. In a 2008 Advisory, FinCEN correctly noted "the Government of Iran's continued attempts to conduct… terrorist financing." As FinCEN accurately explained: "Through state-owned banks, the Government of Iran disguises its involvement in … terrorism activities through an array of deceptive practices specifically designed to evade detection. The Central Bank of Iran and Iranian commercial banks have requested that their names be removed from global transactions in order to make it more difficult for intermediary financial institutions to determine the true parties in the transaction. … The U.S. Department of the Treasury is particularly concerned that the Central Bank of Iran may be facilitating transactions for sanctioned Iranian banks."

48.     Iran's use of its state owned or controlled banks to carry out its constitutional "priorities and principles," which include Iran's Policy and Goals, by, *inter alia*, using its banks to finance terrorism, has resulted in those banks, including defendants CBI, BSI and BSPLC, being subjected to sanctions by the United States government.

### D.     This Action Does Not Arise From an "Act of War"[1]

49.     Hezbollah's military wing might, on occasion, conduct military operations that would, if carried out by a sovereign state, be deemed compliant with the Law of Armed Conflict ("LOAC") (defined, in particular, with reference to Common Article 3 of the Geneva Conventions).

50.     But Hezbollah, as a terrorist organization, can never engage in military operations that are in fact compliant with LOAC. Hezbollah is not the armed forces or military of any nation. Rather, Hezbollah is a terrorist group that systematically uses violent and destructive acts for its political ends. Such an organization is, by definition, not in compliance with LOAC.

51.     During the relevant period, Hezbollah and the Israeli army were engaged in violent clashes. Contemporaneous with Hezbollah's fight with the Israeli army, Hezbollah planned and executed terrorist attacks against civilians.

52.     While Hezbollah's terrorist attacks were certainly violations of LOAC, and were not "act[s] of war" for the purposes of 18 U.S.C. § 2336 (as explained further infra), even its use of force against the  Israeli army was not "act[s] of war." The use of force by a terrorist organization, similarly, can never be an "act of war" for the purposes of 18 U.S.C. § 2336. *Morris v. Khadr*, 415 F.Supp.2d 1323 (D. Utah 2006).

---

[1]  While 18 U.S.C. § 2336 is not jurisdictional, BSI and BSPLC have argued otherwise. Accordingly, absent controlling precedent from the First Circuit or the Supreme Court and out of an abundance of caution, plaintiffs address this issue without conceding that ATA § 2336 is jurisdictional.

53.     Morris held that an attack by al Qaeda on U.S. soldiers serving in the line of duty (who were otherwise legal targets under LOAC) was not an "act of war" for the purposes of § 2336.

54.     Morris involved an attack on a legal military target. This case involves an attack on a non-belligerent civilian population sector.

55.     An act that, viewed independently (and without regard to who committed it), is not compliant with LOAC can never be deemed an "act of war" for the purposes of § 2336. *Estate of Klieman v. Palestinian Authority*, 424 F.Supp.2d 153 (D.D.C. 2006); *Biton v. Palestinian Interim Self-Government Authority*, 412 F.Supp.2d 1 (D.D.C. 2005). *Klieman* explicitly held that "[a]s a matter of law, an act that violates established norms of warfare and armed conflict under international law is not an act occurring in the course of armed conflict." *Klieman*, 424 F. Supp. 2d at 166.

56.     The terrorist attack giving rise to this litigation involve a rocket attack on a civilian man who was out riding his bicycle in a civilian population center. David Martin Lelchook was a noncombatant civilian minding his own business when he was struck and killed by a barrage of rockets fired by terrorists indiscriminate at civilian populations. The attack on Mr. Lelchook was a clear and indisputable violation of LOAC.

57.     Being that the attack on Mr. Lelchook was a violation of LOAC, it could not have been an "act of war" for the purposes of § 2336. *Klieman*, supra; *Biton*, supra.

58.     Moreover, the murder of an innocent non-combatant civilian can never be deemed to have occurred "in the course of" an act of war, as required by 18 U.S.C. § 2331. Such acts form no legitimate part of any war.

59.     In the event that the defendants attempt to escape liability on the ground that the Hezbollah Rocket Barrage was an "act of war," Plaintiffs offer these allegations, in addition to those that appear elsewhere in the complaint.

60.     The term "act of war," for the purposes of 18 U.S.C. § 2336(a), is defined in 18 U.S.C. § 2331 as "any act occurring in the course of (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin."

61.     As such, two conditions must be fully satisfied under the "act of war" exclusion of 18 U.S.C. § 2336 to preclude recovery under the ATA for the terrorist attack that killed David Martin Lelchook. The first condition requires that the missile attack that killed civilian non-combatant David Martin Lelchook must have occurred "in the course of" an act of war. The second condition requires that an "act of war", as defined by 18 U.S.C. § 2331(4), existed. 18 U.S.C. §2331(4) defines "act of war" as a: (i) "declared war"; or (ii) "armed conflict…between two or more nations"; or (iii) "armed conflict between military forces of any origin."

62.     The terrorist attack that killed David Martin Lelchook did not occur "in the course of" war or armed conflict, as required by 18 U.S.C. § 2331. The murder of a non-combatant non-belligerent civilian riding his bicycle in a civilian area by a terrorist organization cannot and should not be considered an  act that occurs "in the course of" an act of war.

63.     Moreover, efforts of the United States and Israel to combat Hezbollah terrorism prior to and in 2006cannot conceivably be portrayed as an "act of war" as defined by any of the three definitions found in 18 U.S.C. § 2331(4).

64.     The facts in the instant case are materially similar to those of *Sokolow v. Palestine Liberation Org.*, 583 F. Supp. 2d 451 (S.D.N.Y. 2008). *Sokolow* held that:

There has been no showing that the situs of the attacks were in any combat or militarized zone, or were otherwise targeted at military or governmental personnel or interests. Rather, plaintiffs allege that the attacks were intentionally targeted at the civilian population. They were purportedly carried out at locations where noncombatants citizens would be known to congregate…. Additionally the use of bombs, under such circumstances, is indicative of an intent to cause far-reaching devastation upon the masses. The "benefit" of such weaponry is its merciless capability of indiscriminately killing and maiming untold numbers in heavily populated civilian areas. Such claimed violent attacks upon noncombatant civilians, who were allegedly simply going about their everyday lives, *do not constitute acts of war for purposes of the ATA.*

*Sokolow*, 583 F. Supp. 2d at 459 (emphasis added).

65.     The "acts of war" described by 18 U.S.C. § 2331(4) include only acts "occurring in the course of" declared war or armed conflict. Court's have interpreted the "in the course of" requirement, in the specific context of 18 U.S.C. § 2331(4), as a gatekeeper provision in that, "the statutory phrase 'in the course of' [found in 18 U.S.C. § 2331(4)] necessarily imposes limitations on what 'acts' constitute 'acts of war' within the meaning of §2333(a)—as defined in§2331(4)." *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 166 (D.D.C.2006).

66.     *Klieman* is now nearly ten years old. Congress has done nothing to "correct" *Klieman*, suggesting that Congress has assented to the interpretation in *Klieman*.

67.     As such, and for the following reasons, this Court should accordingly hold that the language "in the course of" is a gatekeeper phrase which imposes limitations on the types of acts which fall within the scope of "acts of war" within the meaning of §2333(a)—as defined in §2331(4).

68.     Federal courts have consistently interpreted the phrase "in the course of" as a gatekeeper phrase that is intended to exclude as a matter of law a subset of conduct which— because of the character of its nature and substance—deviates from and/or is insufficiently related to the general set of conduct governed by the provision in question."Identical words, even

occurring in unrelated statutes, should be interpreted to have identical meanings whenever reasonably possible." *Wachovia Bank v. Schmidt*, 388 F.3d 414 (4th Cir. 2004) rev'd, 546 U.S. 303 (2006) (citing *Overstreet v. N. Shore Corp*., 318 U.S. 125, 129-30 (1943)) (construing the phrase "engaged in commerce" in the Fair Labor Standards Act in light of existing constructions of the same phrase in the Federal Employers' Liability Act, without describing the two statutes as in pari material); *Link v. City of Shelton*, 443 A.2d 902, 904 (Conn. 1982)(construing the phrase "in the course of his duty "in the statute in question in light of the same phrase in the "unrelated" workers' compensation statute).

69.     Thus, for example purposes only, in analyzing the construction and application of "in the course of" language as applied in various statutes and decisions, the Controlled Substance Act, which prohibits the distribution of narcotics, exempts a "practitioner" from its criminal provisions. 21 U.S.C. § 829. The term "practitioner" is defined by the act as:

> [A] physician, dentist, veterinarian, scientific investigator, pharmacy, hospital, or other person licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance *in the course of* professional practice or research.

21 U.S.C. § 802(21)(emphasis added).

70.     On the basis of the "in the course of" language contained in 21 U.S.C. § 802, courts have consistently held that a person who meets the definition of "practitioner" as a matter of fact (i.e. is in fact a practicing physician "licensed . . . to distribute . . . a controlled substance . . . ") will nevertheless be excluded as a matter of law from the criminal immunity granted a "practitioner" if he distributes a narcotic in the course of the practice of medicine, but in violation of the rules of legitimate medical practice:

> Title II of the Comprehensive Drug Abuse Prevention and Control Act of1970 and the regulations issued pursuant to the act make it illegal for a physician to

dispense directly to the ultimate user a schedule II controlled substance other than "in the course of his professional practice." Appellant contends that those words do not warn the physician of what conduct is proscribed, and that the statute is without objective standards and is subject to diverse interpretation. Although this issue has not been previously determined concerning the present act, the same standard has been judicially interpreted in prior federal drug statutes. Manifestly the language "*in the course of* professional practice" is intended to limit the immunity of a licensed practitioner. It is apparent that a licensed practitioner is not immune from the act solely due to his status, *White v. United States*, 399 F.2d 813 (8th Cir. 1968), but rather, because he is expected to prescribe or dispense drugs *within the bounds of his professional practice of medicine*.

*United States v. Collier*, 478 F.2d 268, 270-272 (5th Cir. 1973)(emphasis added).

71.    Likewise,

[T]he phrase "in the course of professional practice" . . . has been in the statute books since 1914 . . . The language clearly means that a doctor is not exempt from the statute when he takes actions that he does not in good faith believe are for legitimate medical purposes. The Supreme Court had several occasions to interpret this language when it was used in the Harrison Narcotics Law s 2, 38 Stat. 785. For example, in *Jin Fuey Moy v. U S.*, 254 U.S. 189, 194(1920) (emphasis added), the Court noted that "the phrases 'to a patient' and '*in the course of* his professional practice only' are *intended to confine the immunity of a registered physician, in dispensing the narcotic drugs mentioned in the act, strictly within the appropriate bounds of a physician's professional practice* . . . " Two years later the Court again explained the meaning of the statute: "(T)he purpose of the exception is to confine the distribution of these drugs to the regular and lawful course of professional practice." *United States v. Behrman*, 258 U.S. 280, 287, 42 S. Ct. 303, 304, 66 L. Ed.619 (1922) (emphasis added). In another case the Court said that "(t)he disputed question was whether the defendant issued the prescriptions in good faith in the course of his professional practice." *Boyd v. United States*, 271 U.S. 104, 105, 46 S. Ct. 442, 70 L. Ed. 857 (1926) (emphasis added).

*United States v. Rosenberg*, 515 F.2d 190, 197-198 (9th Cir. 1975) (emphasis added).

72.    Thus, despite the fact that the plain terms of 21 U.S.C. § 829 immunize all licensed practitioners from criminal liability, courts have interpreted the "in the course of" language in 21 U.S.C. § 802 as excluding from immunity as a matter of law persons who are as a matter of fact licensed medical practitioners, when such persons violate the accepted rules of medical practice or otherwise violate standards or statutes.

73.     As a second example, the Jones Act (Merchant Marine), 46 U.S.C. § 30104 (emphasis added), permits a seaman (or his personal representative) to bring an action for personal injury or death suffered "in the course of his employment." It is well-established that the "in the course of" requirement contained in the Jones Act operates to restrict the protection of the Act, and that as a result of the "in the course of" proviso the scope of recovery under the Act is narrower than that allowed seamen under the "maintenance and cure" doctrine. *See Colon v. Apex Marine Corp.*, 832F. Supp. 508, 513-515 (D.R.I. 1993) aff'd, 35 F.3d 16 (1st Cir. 1994)(citing cases). Indeed, Colon emphasized that: "We cannot ignore the phrase 'in the course of his employment,' because it was intended to mean what it says." Id. at 514 (quoting *Szopko v. Kinsman Marine Transit Co.*, 397 N.W.2d 171 (Mich.1986)).

74.     Moreover, in the seminal case interpreting the "in the course of" employment requirement in the Jones Act, *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S.36 (1943), the Supreme Court held that "in the course of his employment" refers to, "the nature of the service and its relationship to the operation of the vessel plying in navigable waters." *Id*. at 42-43. As the Fifth Circuit noted:

> [T]he Supreme Court in *O'Donnell* . . . gave a general guideline to determine if the seaman is acting 'in the course of his employment.' The Court declared:
>
> > 'The right of recovery in the Jones Act . . . depends not on the place where the injury is inflicted *but on the nature of the service and its relationship to the operation of the vessel* plying innavigable waters.' . . .
>
> Although cast initially in terms of jurisdiction the 'nature of the service and its relationship to the operation of the vessel' criterion *quite naturally became the test for determining liability as well*.

*Vincent v. Harvey Well Serv.*, 441 F.2d 146, 147 (5th Cir. 1971) (emphasis added); *see also*, *e.g.*, *Magnolia Towing Co. v. Pace*, 378 F.2d 12 (5th Cir. 1967) ("It is now settled that the right of recovery as a seaman under the Jones Act does not depend 'on the place where the injury is

inflicted but on the nature of the service and its relationship to the operation of the vessel plying in navigable waters.'") (quoting *O'Donnell*, 63 S. Ct. 488)(emphasis added).

75.     Therefore, because the "in the course of" requirement contained in the Jones Act goes to the nature of the conduct and its substantive relatedness to the operation of the vessel (rather than place of the injury) the question of whether a given injury occurred "in the course of" employment is primarily a question of law rather than of fact. *See, e.g., Colon*, 832 F. Supp. at 515 ("On the undisputed facts in this case, plaintiff was not acting 'in the course of his employment' as a matter of law at the time of his injury.").

76.     As a third example, the phrase "in the course of" also appears in the Warsaw Convention, 49 U.S.C.§ 40105, a treaty governing air carrier liability that has been much-analyzed by the federal courts. Article 17 provides that an air carrier:

> [S]hall be liable for damages sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger if the accident which caused the damage so sustained took place on board the aircraft or *in the course of* any of the operations of embarking or disembarking.

*Id.* (emphasis added). In determining whether an accident occurred "in the course of" embarking or disembarking within the meaning of Article 17, most of the federal circuits have adopted a tripartite test (first set out in *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir.1975)) which examines "(1) the nature of the activity the passenger was engaged in; (2) under whose control or at whose direction the passenger was under; and (3) the location of that activity." *Dazo v. Globe Airport Sec. Services*, 268 F.3d 671, 677 (9th Cir. 2001) *superseded on reh'g*, 295 F.3d 934 (9th Cir. 2002) (citing *Day*) (emphasis added). *See also Kalantar v. Lufthansa German Airlines*, 276 F. Supp. 2d 5 (D.D.C. 2003). Under *Day* and progeny, an accident will not be deemed to have occurred "in the course of" embarking or disembarking when the nature of the passenger's activity at the time of the accident is insufficiently related to the acts of embarking or

disembarking, even if that activity occurs in close proximity to embarking or disembarking and while the passenger is under the control of the airline. *See*, *e.g.*, *Abu Hamdeh v. Am. Airlines, Inc.*, 862 F. Supp. 243, 248 (E.D. Mo. 1994) ("Location should not be considered alone . . . when determining if plaintiff was in the course of embarking upon defendant's flight. In addition to the location of the accident, the nature of the activity in which plaintiff was engaged must be examined to determine if that activity can fairly be considered part of 'the operations of embarking.'") (quoting and *citing Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152, 155 (3d Cir. 1977)) (internal citations and quotation marks omitted).

77.     It follows that, just as a court must examine the nature of a passenger's activity and whether it can be considered as part of the operation of embarking or disembarking when considering whether to apply the Warsaw Act to a passengers injuries, the court must similarly look at the nature of the violent activity, here a terrorist attack, to determine if such an act occurs "in the course of" an act of war within the meaning of the ATA. Given the above examples concerning the gatekeeper language "in the course of" and the settled law that "[i]dentical words, even occurring in unrelated statutes, should be interpreted to have identical meanings whenever reasonably possible," *Wachovia Bank*, 388 F.3d 414, it is inescapable that the Hezbollah Rocket Barrage was not done "in the course of" an act of war.

78.     *Klieman* held that, "[a]s a matter of law, an act that violates established norms of warfare and armed conflict under international law is not an act occurring in the course of armed conflict." *Estate of Klieman*, 424 F. Supp. 2d at 166. Attacks against civilians during the course of active hostilities, "long have been recognized in international law as violations of the law of war." *Kadic v. Karadzic*, 70F.3d 232, 242 (2d Cir. 1995). Moreover, *Sokolow* held that "violent attacks upon noncombatant civilians, who were allegedly simply going about their everyday

lives, do not constitute acts of war for purposes of the ATA." *Sokolow*, 583 F. Supp. 2d at 459. As such, it is settled law that the terrorist attack which claimed the life of civilian David Martin Lelchook cannot, as a matter of law, occur "in the course of" war or armed conflict and, as such, these claims are not excluded under the ATA by the act of war exclusion.

79.     "[A]cts of murder, rape, torture, and arbitrary detention of civilians, committed in the course of hostilities, violate the law of war. [Such a]trocities…have long been recognized in international law as violations of the law of war." *Kadic*, 70F.3d at 238. Further support for the proposition that murdering innocent civilians violates the law of war is found in an acclaimed treatise written by Ian Brownlie—a preeminent scholar/"publicist" of international law. This Court may rely on Professor Brownlie as the norms of contemporary international law are found and recognized by "consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law." *Id*. at 238. Brownlie writes in his treatise, Principles of Public International Law, that "[t]here is, at this stage in the historical development of the concept of international crimes, sufficient material to provide are liable assessment of those offences which are recognized as a part of general or customary international law. In this context the provisions of the Statute of the International Criminal Court constitute good evidence of the offences forming part of general international law…" Brownlie then points to Article 8 of the Statute of the International Criminal Court which defines "War Crimes" as:

War Crimes (Art.8)
* * *
2. For the purpose of this Statute, 'war crimes' means: … (b) Other serious violations of the laws and customs applicable in international armed conflict, within the established framework of international law, namely, any of the following acts (in part only):

> (i) Intentionally directing attacks against the civilian population as such or against individual civilians not taking direct part in hostilities;
> (ii)Intentionally directing attacks against civilian objects, that is, objects which are not military objectives;…

Ian Brownlie, PRINCIPLES OF PUBLIC INTERNATIONAL LAW 589-591.

80.     It is thus clear that, "intentionally directing attacks against civilian population as such or against individual civilians not taking direct part in hostilities" is a war crime and as such is contrary to international law. David Martin Lelchook was targeted as a civilian by Hezbollah in 2006 when it launched and directed a rocket at a kibbutz located in Israel which was inhabited by a civilian population. This action is cognizable as a war crime and as such is contrary to international law and must be excluded from the concept of "war."

81.     Given that David Martin Lelchook's murder is excluded from the concept of "war," it could not have occurred "by reason of" an act of war.

82.     Even if, *arguendo*, the "in the course of" gate keeping language does not preclude the application of this exclusion in this case, the act of war exclusion does not apply given that none of the three definitions of "act of war" as identified by 18 U.S.C. § 2331(4) apply. The act of war exclusion may only be applied in the event of (A) declared war, (B) armed conflict whether or not war has been declared, between two or more nations or, (C) armed conflict between military forces of any origin. 18 U.S.C. § 2336(a). As outlined below, none of these three circumstances existed in 2006 when David Martin Lelchook was murdered as a result of the Hezbollah terrorist attack in Israel.

83.     Under Israeli law, there was, at all relevant times, no "declared war" against Lebanon.

84.     Under Israeli law, a declaration of war can only be made pursuant to Section 40(a) of the Basic Law: Government. Section 40 of the Basic Law: Government states in pertinent part:

> **Section 40.**
> (a) The state may only begin a war pursuant to a Government decision.
> (b) Nothing in the provisions of this section will prevent the adoption of military actions necessary for the defence of the state and public security.
> (c) Notification of a Government decision to begin a war under the provision of subsection (a) will be submitted to the Knesset Foreign Affairs and Security Committee as soon as possible; the Prime Minister also will give notice to the Knesset plenum as soon as possible; notification regarding military actions as stated in subsection (b) will be given to the Knesset Foreign Affairs and Security Committee as soon as possible.

*Id.*

85.     Section 40(a) of the Basic Law: Government must be contrasted with Section 40(b) of the same Basic Law; while Section 40(a) provides for declared "war", Section 40(b) provides for a totally separate concept under Israeli law, namely, "military actions necessary for the defence of the state and public security." *See Id*. at §40(b). As such, the concepts of "military actions necessary for the defence of the state and public security" (found under section 40(b)) and "war" (found under section 40(a)) are two different animals. In August of 2006, while there may have existed a situation under 40(b) where military actions were occurring which were "necessary for the defence of the state and public security," there was no government decision under 40(a) to declare a war.

86.     Then-Prime Minister Olmert made certain statements to the media in response to Hezbollah's activities, some of which may have included the word "war." But none of those

statements amounted to a declaration of war pursuant to Basic Law: Government § 40(a). Nor are they dispositive of reality.

87.     Similarly, the fact that at some time following the July and August 2006 Hezbollah attacks on Israel, and Israel's response thereto, people have referred to that era as the "Second Lebanon War" does not make it a war. The reference by some within Israel to the engagement with Hezbollah as a "war" does not make it a war as a matter of law, much less fact.

88.     Prime Minister Olmert's statement cannot be read in a vacuum, but rather must be viewed in the context of Hezbollah's decades of terrorist acts. Specifically and contemporaneous with the references suggesting that Israel was at "war," the following statements were also made:

"Lebanon is not a party to the dispute."

"Prime Minister Olmert emphasized that Israel is not fighting Lebanon but the terrorist element there, led by Nasrallah and his cohorts, who have made Lebanon a hostage and created Syrian- and Iranian-sponsored terrorist enclaves of murder."

H.E. Ambassador Dan Gillerman, Permanent Representative of Israel to the United Nations, noted that, "Israel has no quarrel with Lebanon. Israel has no battle with Lebanon. Israel has no war with Lebanon."

Ambassador Gillerman additionally stated: "Why is Israel in Lebanon today? Why is Israel acting against Lebanon? Israel left every single inch of Lebanon. Israel is there only to protect itself against a blatant act of war, the kidnapping of its soldiers and the shelling of its cities and towns by thousands of [Hezbollah] rockets, which are only a fraction of the arsenal of death and destruction that Lebanon has allowed to be amassed in the southern part of its territory,"

Ambassador Gillerman further commented: "I would like to ask my Lebanese friend: tell your people, the brave people of Lebanon, the Government that you represent and your brave Prime Minister, for who we have a lot of respect, that the demonstrations held today in Beirut should not be against the United Nations they should be against Hezbollah. Hezbollah is the one that has caused you all this pain. Hezbollah is the monster that you have allowed to grow. If you had taken care of it before, if you had deployed your forces in the south, this would never have happened. And if the Security Council had enforced resolution 1559 (2004), this would never have happened."

Given that these statements were made contemporaneously with isolated statements suggesting the existence of a "war," it is clear that Israel was not targeting Lebanon as a nation and, as such, declared war did not exist as no two sovereign states were involved.

89.     Rather, Israel was responding to terrorist attacks by Hezbollah and under Israel Basic Law: Government §40(b), took "military actions necessary for the defence of the state and public security." Moreover, the government of Lebanon clearly did not declare war on Israel; the Lebanese issued a letter to the Secretary General of the UN and the President of the UN Security Council which clearly declares that, "[t]he Lebanese Government was not aware of the events that occurred and are occurring on the international Lebanese border…The Lebanese Government is not responsible for these events and does not endorse them."

90.     Secondly, there was no "armed conflict…between two or more nations" during the relevant time period.

91.     As noted, Hezbollah (a designated foreign terrorist organization), and not Lebanon, was the target of Israel's defensive military operations during the relevant time period. As such, 18 U.S.C. § 2331(4)(B) does not apply since there was no conflict at the relevant time between two nations. A "nation," by definition, is a state sovereign over its people and boarders. Israel is a "nation," Hezbollah is (and was, at all relevant times) not.

92.     President Bush, in a letter to Congress on July 18, 2006, made this distinction clearly:  "Hostilities involving Israeli forces and Hezbollah terrorists in Lebanon commenced on July 12, 2006[.]"

93.     Similarly, UN Security Council Resolution 1701, which ended the dispute, made clear that this was not an armed conflict between two nations. The Resolution called for "a full cessation of hostilities based upon, in particular, the immediate cessation by Hezbollah of all

attacks and the immediate cessation by Israel of all offensive military operations." No mention is made of Lebanon's military units.

94.     Third, and finally, Hezbollah, as a designated foreign terrorist organization is not a "military force" and, accordingly, there was no "armed conflict between military forces of any origin."

95.     Settled case law makes clear that:

> [t]he [Anti-Terrorism Act]'s legislative history…suggests that a designated terrorist organization cannot constitute a "military force" for purposes of 18 U.S.C. § 2331(4)(C)…Even though subsection (C) extends the "act of war" exclusion to armed conflicts between military forces that are not the military forces of recognized nations, there is no sound basis for viewing the subsection (C) exclusion as extending to terrorist organizations. To find otherwise would pervert the every purpose of the ATA, which was enacted to deter terrorist activity and hold liable those who engage in it.

*Weiss v. Arab Bank, PLC*, 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007). At all relevant times in this litigation, Hezbollah has been designated as a foreign terrorist organization and, as evidenced *supra*, the relevant hostilities were between Israel and Hezbollah. Terrorist organizations such as Hezbollah cannot be considered a military force of any origin and the rationale behind *Weiss* applies in the instant case.

96.     The exception provided for in 18 U.S.C. §2331(4)(C) is inapplicable in part because, terrorist organizations, as a matter of law, cannot be included in this exception.

97.     Accordingly, none of 18 U.S.C. § 2331(4)'s definitions of 'war' apply in the instant case.

98.     Indeed, in an action filed by the instant plaintiffs against another bank involved in funding Hezbollah, Judge Alvin K. Hellerstein of the Southern District of New York denied a motion to dismiss under ATA § 2336 and found that:

There is no act of war here. There never was a declared war between Hezbollah and the United States. It's like a fungus grown in Lebanon but it's not a state itself and there is no war between Hezbollah and the United States, except our war against terrorism which is not really a war, a really declared war. I don't think the act-of-war exception applies. In any event, these were not military targets. There is no military target around. These were just missiles hurled into Israel with the hope that it would land on somebody rather than just a field.

*Lelchook v. Commerzbank AG*, Civ. No. 10-5795 (S.D.N.Y.), at DE 37, p. 25 and at DE 30.[2]

### D.     <u>The Defendants' Provision of Funding to Hezbollah Between 2001 and 2006</u>

99.      Hezbollah requires financial support: (a) in order to build and maintain its operational infrastructure for the planning and execution of terrorist attacks; (b) in order to purchase and store weapons, explosives and other materiel used by it to carry out terrorist attacks; (c) in order to pay, train, transport and shelter its terrorist operatives; and (d) in order to carry out specific terrorist attacks.

100.      Between 2001 and 2006, as part of their campaign to carry out Iran's Policy and Goals, the defendants herein provided Hezbollah with over $50 million in financial support (hereinafter: "Defendants' Transfer of Funds to Hezbollah") with the specific intent and purpose of facilitating, enabling and causing Hezbollah to carry out terrorist attacks against American and Israeli targets in order to advance Iran's Policy and Goals. Defendants' Transfer of Funds to Hezbollah was carried out by defendants with the specific intent and purpose of (a) intimidating and influencing the United States government and public and thereby weakening, harming and undermining the United States militarily, economically and politically and (b) intimidating and influencing the Israeli government and public and thereby bringing about the eventual

---

[2] In a companion case filed by the plaintiffs in the District Court for the District of Columbia, Case No. 10-01184, the Court dismissed plaintiffs' claims against BSI and BSPLC *sua sponte* pursuant to ATA § 2336 based on a decision in another case. However, that decision has no preclusive effect here because BSI and BSPLC were never served in plaintiffs' action in the District of Columbia and because the issues were never briefed.

eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

101.    Defendants' Transfer of Funds to Hezbollah was carried out by defendants in the following manner: defendant CBI transferred funds belonging to defendant Iran to defendant BSI; defendant BSI then transferred these funds to defendant BSPLC in London; defendant BSPLC then transferred these funds to accounts controlled by Hezbollah in branches of defendant BSI in Beirut, from which Hezbollah received these funds.

102.    Defendants' Transfer of funds to Hezbollah has been confirmed by the United States government. An October 2007 Press Release issued by the United States Department of Treasury explained the fact that the defendant Iran transferred the funds from defendant CBI through defendants BSI and BSPLC to Hezbollah:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London [*i.e.*, BSPLC] to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

103.    The Department of Treasury reiterated these facts in a November 2008 Press Release, correctly stating that:

> Iran Uses its Banks to Finance Terrorism.  In a number of cases, Iran has used its state-owned banks to channel funds to terrorist organizations.  Between 2001 and 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts that support acts of violence.

104.    But for Defendants' Transfer of Funds to Hezbollah, Hezbollah's ability (a) to build and maintain its operational infrastructure for the planning and execution of terrorist

attacks; (b) to purchase and store weapons, explosives and other materiel used by it to carry out terrorist attacks; (c) to pay, train, transport and shelter its terrorist operatives; and (d) to carry out specific terrorist attacks, including the Hezbollah Rocket Barrage and the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein, would have been severely crippled and limited.

105.    Defendants' Transfer of Funds to Hezbollah substantially increased Hezbollah's ability to plan and carry out terrorist attacks in furtherance of Iran's Policy and Goals, and facilitated and caused the execution of terrorist attacks by Hezbollah, including the Hezbollah Rocket Barrage and the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein.

106.    The defendants gave substantial aid, assistance and encouragement to one another and to Hezbollah and provided massive financial support to Hezbollah, and thereby aided and abetted Hezbollah, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism by Hezbollah in furtherance of Iran's Policy and Goals, including the Hezbollah Rocket Barrage and the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein. The defendants did so with actual knowledge that Hezbollah had killed and injured numerous U.S. and other civilians in terrorist attacks and with the knowledge and specific intent that additional U.S. and other innocent civilians would be killed and/or injured as a result of their aiding, abetting and provision of material support and resources to the Hezbollah.

107.    The defendants knowingly and willingly conspired, agreed and acted in concert with one another and with Hezbollah, in order to advance Iran's Policy and Goals and pursuant to the Hezbollah Agreement, to cause and facilitate the commission of acts of extrajudicial

killing and international terrorism including the Hezbollah Rocket Barrage and the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein. The defendants did so with actual knowledge that Hezbollah had killed and injured numerous U.S. and other civilians in terrorist attacks and with the knowledge and specific intent that additional U.S. and other innocent civilians would be killed and/or injured as a result of their conspiracy with Hezbollah.

108.    At all relevant times, CBI was a political subdivision of Iran, and performed acts on behalf and at the direction of Iran, in order to advance Iran's Policy and Goals, pursuant to the Hezbollah Agreement and within the scope of its agency and office (within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c)), that caused the Hezbollah Rocket Barrage and the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein, in that CBI implemented and acted as a conduit and instrumentality for Iran's provision of funds to Hezbollah for the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage and the Rocket Attack, as described herein.

109.    Iran ordered, directed, authorized, ratified and approved the acts of CBI. Accordingly, Iran is vicariously liable for the acts of CBI.

110.    At all relevant times, BSI was an agent of Iran, and performed acts on behalf and at the direction of Iran, in order to advance Iran's Policy and Goals, pursuant to the Hezbollah Agreement and within the scope of its agency and office that caused the Hezbollah Rocket Barrage and the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein, in that BSI implemented and acted as a conduit and instrumentality for Iran's provision of funds to Hezbollah for the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage and the Rocket Attack, as described herein.

111.    Iran ordered, directed, authorized, ratified and approved the acts of BSI. Accordingly, defendant Iran is vicariously liable for the acts of BSI.

112.    At all relevant times, BSPLC was an agent of Iran, and performed acts on behalf and at the direction of Iran, in order to advance Iran's Policy and Goals, pursuant to the Hezbollah Agreement and within the scope of its agency, that caused the Hezbollah Rocket Barrage and the Rocket Attack that killed David Martin Lelchook and harmed the plaintiffs herein, in that BSI implemented and acted as a conduit and instrumentality for Iran's provision of funds to Hezbollah for the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage and the Rocket Attack, as described herein.

113.    Iran ordered, directed, authorized, ratified and approved the acts of BSPLC. Accordingly, Iran is vicariously liable for the acts of BSPLC.

**E.    The Hezbollah Rocket Barrage**

114.    Between July 12, 2006 and August 14, 2006, as part of its implementation of Iran's Policy and Goals, Hezbollah fired thousands of rockets and missiles (hereinafter "rocket" or "rockets") at civilians in northern Israel.

115.    The Hezbollah Rocket Barrage was not in the course of an "armed conflict…between two or more nations," as described by 18 U.S.C. § 2331(4), because Israel had no conflict with Lebanon and Hezbollah is not and never was a "nation."

116.    The Hezbollah Rocket Barrage was not in the course of an "armed conflict between military forces," as described by 18 U.S.C. § 2331(4), because a designated terrorist organization was not intended by Congress to constitute a "military force" and does not constitute a "military force." Indeed, the very purpose of § 2331 was to "deter terrorist activity

and hold liable those who engage in it." *Weiss v. Arab Bank, PLC*, 2007 WL 4565060 (E.D.N.Y. 2007).

117.    The United States repeatedly confirmed that the Hezbollah Rocket Barrage harmed the United States and its national interests. For example, on or about July 17, 2006, then President George W. Bush stated the view of the United States that the Hezbollah Rocket Barrage was being directed at America's friend and ally and must be stopped -  "[] it's now clear for all to see that there are terrorist elements who want to destroy our democratic friends and allies, and the world must work to prevent them from doing so."

118.    A few days later, then-President Bush explained the United States' commitment to peace in the region which Iran and Syria were trying to destroy through their terrorist proxy – Hezbollah: "For many years, Syria has been a primary sponsor of Hezbollah and it has helped provide Hezbollah with shipments of Iranian-made weapons…Iran's regime has also repeatedly defied the international community with its ambition for nuclear weapons and aid to terrorist groups. Their actions threaten the entire Middle East and stand in the way of resolving the current crisis and bringing lasting peace to this troubled region."

119.    Bush reiterated these sentiments at an August 7, 2006 press conference during which he stated: "Now, I appreciate people focusing on Syria and Iran, and we should, because Syria and Iran sponsor and promote Hezbollah activities -- all aimed at creating chaos, all aimed at using terror to stop the advance of democracies."

120.    Separately, then-White House Press Secretary Tony Snow echoed the United States position that: "Hizbullah, and also its supporting nations, Iran and Syria, need to understand that we are committed to peace and democracy in the region, and we're not going to back away from it."

121.    Likewise, then-Secretary of State Condoleezza Rice explained the United States interest in creating a new Middle East, stating: "What we're seeing here, in a sense, is the growing -- the birth pangs of a new Middle East. And whatever we do, we have to be certain that we are pushing forward to the new Middle East, not going back to the old one."

122.    United States interests, of course, are harmed whenever United States citizens are killed or injured by terrorism. Indeed, Congress has passed legislation giving United States citizens private rights of action against state sponsors of terrorism and others who provide material support to terrorist to sue for damages arising from terror attacks in which such United States citizens were harmed. *See* 28 U.S.C. § 1605A; 18 U.S.C. § 2333. *See also Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) ("[T]he Government's interest in combating terrorism is an urgent objective of the highest order.").

123.    Over 43 civilians were murdered by the Hezbollah Rocket Barrage, which constituted "extrajudicial killings" within the meaning of 28 U.S.C. § 1605A. Among those killings was the murder of David Martin Lelchook.

124.    Those civilians were deliberately targeted as such by Hezbollah. They were not collaterally injured as a result of an attack on a military target, as defined by LOAC and accepted norms of warfare.

125.    On August 2, 2006, David Martin Lelchook, a 52-year old American citizen, was innocently riding his bicycle in Kibbutz Saar, when a rocket launched by Hezbollah struck him.

126.    David Martin Lelchook was mortally injured by shrapnel from the initial blast and died thereafter.

127.    David Martin Lelchook is survived by his wife, plaintiff Ester Lelchook, his two daughters, plaintiffs Michal Lelchook and Yael Lelchook, his brother, plaintiff Alexander Lelchook, and his mother, plaintiff Doris Lelchook.

128.    The murder of David Martin Lelchook caused the decedent and his estate severe harm, including conscious pain and suffering, and pecuniary loss.

129.    The murder of David Martin Lelchook caused plaintiffs Ester Lelchook, Michal Lelchook, Yael Lelchook, Alexander Lelchook and Doris Lelchook severe and permanent psychological, emotional and financial injuries and harm.

### F.    **Plaintiffs' Injuries Are the Result of Defendants' Conduct**

130.    Hezbollah carried out the Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook, thereby causing the injuries and harm suffered by the plaintiffs herein.

131.    Defendants' Transfer of Funds to Hezbollah substantially increased and facilitated Hezbollah's ability to plan, to prepare for and to carry out the Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook.

132.    But for Defendants' Transfer of Funds to Hezbollah, Hezbollah's ability (a) to build and maintain its operational infrastructure for the planning and execution of the Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook; (b) to pay, train, transport and shelter the terrorist operatives who carried out the Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook; and (c) to carry out the Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook, would have been severely crippled and limited.

133.    The Hezbollah Rocket Barrage, including the Rocket Attack that killed David Martin Lelchook, was thereby enabled, facilitated and proximately caused by the conduct of defendants described herein.

134.    Plaintiffs' injuries and harm are therefore the direct and proximate result of defendants' conduct.

## FIRST CLAIM FOR RELIEF
## AGAINST IRAN AND CBI, ON BEHALF OF ALL PLAINTIFFS
## ACTION FOR DAMAGES UNDER 28 U.S.C. §1605A(c)

135.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

136.    Defendants Iran and CBI, provided material support and resources to Hezbollah, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Hezbollah Rocket Barrage, including the Rocket Attack.

137.    Defendant CBI is an agent of Iran which, within the scope of its agency, provided Hezbollah with the material support and resources that caused and facilitated the Hezbollah Rocket Barrage, including the Rocket Attack.

138.    The decedent and the plaintiffs suffered severe economic, physical, psychological, emotional and other personal injuries as a result of the Rocket Attack, including: conscious pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and pecuniary and economic loss, including loss of income and financial support.

139.    As a direct and proximate result of the conduct of defendants Iran and CBI, the decedent and the plaintiffs suffered the injuries and harm described herein

140.    Defendants Iran and are therefore jointly and severally liable under 28 U.S.C. § 1605A(c) for the full amount of the damages due to the estate of the decedent and to the plaintiffs.

141.    The conduct of defendants Iran and CBI was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF
## AGAINST IRAN AND CBI
## ON BEHALF OF ALL PLAINTIFFS
## ACTION FOR DAMAGES UNDER 28 U.S.C. §1605A(d)

142.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

143.    The conduct of defendants Iran and CBI caused the decedent and the plaintiffs loss of property and financial loss, including loss of future income and loss of financial support.

144.    Defendants Iran and CBI are therefore jointly and severally liable under 28 U.S.C. § 1605A(d) for the full amount of the financial damages caused to the decedent and the plaintiffs.

## THIRD CLAIM FOR RELIEF
## AGAINST BSI AND BSPLC,
## ON BEHALF OF ALL PLAINTIFFS
## ACTION FOR INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)

145.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

146.    The actions of defendants BSI and BSPLC described herein constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

147.    As required by § 2331, the actions of defendants BSI and BSPLC as described herein constituted a violation of the criminal laws of the United States including, without limitation, the provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C, which criminalize the provision of funding to terrorist organizations and/or for terrorist activities.

148.    As required by § 2331, the actions of defendants BSI and BSPLC were dangerous to human life by their nature and as evidenced by their consequences. At least 43 civilians were murdered by the Hezbollah Rocket Barrage, including decedent David Martin Lelchook, which was caused and facilitated by the actions of defendants BSI and BSPLC.

149.    As required by § 2331(1)(B) the actions of defendants BSI and BSPLC were "intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion," in that, in furtherance of Iran's Policy and Goals, between 2001 and 2006, BSI and BSPLC provided Hezbollah with over $50 million in financial support with the specific intent and purpose of facilitating, enabling and causing Hezbollah to carry out acts of violence against American and Israeli targets in order to (a) intimidate and influence the United States government and public and thereby weaken, harm and undermine the United States militarily, economically and politically and (b) intimidate and influence the Israeli government and public and thereby bring about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

150.    As required by § 2331, the actions of defendants BSI and BSPLC transcended national boundaries in terms of the means by which they were accomplished and the persons they appeared intended to intimidate or coerce.

151.    The actions of defendants BSI and BSPLC described herein therefore constitute "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333(a).

152.    As a direct and proximate result of the actions of defendants BSI and BSPLC the decedent and the plaintiffs suffered the injuries and harm described herein.

153.    Defendants BSI and BSPLC are therefore liable for all of the damages due to the estate of the decedent and to the plaintiffs, in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**FOURTH CLAIM FOR RELIEF**
**AGAINST BSI AND BSPLC ON BEHALF OF ALL PLAINTIFFS**
**AIDING AND ABETTING INTERNATIONAL TERRORISM**
**PURSUANT TO 18 U.S.C. § 2333(a)**

154.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

155.    Since its founding and until July 12, 2006 (and until the present day) Hezbollah is and was a radical Islamic terrorist organization that views the State of Israel, the United States and other Western countries as its enemies.

156.    Since its founding and until July 12, 2006 (and until the present day), in furtherance of Iran's Policy and Goals, Hezbollah has used terrorism against American and Israeli targets in an effort to coerce, intimidate and influence the American and Israeli government and public, and thereby weaken and undermine the United States and bring about the ultimate destruction of the State of Israel and the murder or expulsion of the Jews in Israel.

157.    Hezbollah's actions described herein are and were dangerous to human life and constituted a violation of the criminal laws of the United States, since Hezbollah is a violent terrorist organization that, since its establishment has murdered hundreds of innocent civilians, and openly proclaims its intention to murder other such innocent civilians.

158.    Hezbollah's actions described herein transcended national boundaries in terms of the means by which they were accomplished, the persons they appeared intended to intimidate or coerce, and the locales in which Hezbollah operates.

159.    The actions of Hezbollah described herein therefore constituted "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333(a).

160.    BSI and BSPLC knowingly and intentionally transferred $50 million to Hezbollah between 2001-2006, with the specific purpose and intention of enabling and assisting Hezbollah to carry out violent attacks against American and Israeli targets, in furtherance of Iran's Policy and Goals.

161.    The actions of BSI and BSPLC therefore constituted aiding and abetting Hezbollah's "acts of international terrorism" within the meaning of 18 U.S.C. §§ 2331 and 2333(a).

162.    As a direct and proximate result of the actions of defendants BSI and BSPLC the decedent and the plaintiffs suffered the injuries and harm described herein.

163.    Defendants BSI and BSPLC are therefore liable for all of the damages due to the estate of the decedent and to the plaintiffs in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**FIFTH CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS ON BEHALF OF PLAINTIFFS**
**ESTER LELCHOOK, MICHAL LELCHOOK AND YAEL LELCHOOK**
**NEGLIGENCE**
**(Under the Law of the State of Israel)**

164.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

165.    Pursuant to Fed. R. Civ. P. 44.1 plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.

166.    Causes of action in tort in Israeli law are codified in the Civil Wrongs Ordinance (New Version) - 1968, (hereinafter "CWO").

167.    The CWO provides that any person injured or harmed by the civil wrongs (i.e. torts) enumerated in the CWO is entitled to relief from the person liable or responsible for the wrong.

168.    CWO § 35 creates a tort of Negligence.

169.    Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

170.    CWO § 35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

171.    CWO § 36 provides that the obligation stated in the last sentence of § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

172.    By providing and transferring funds to Hezbollah, the defendants performed acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

173.    Defendants did not, in the performance of their occupations, use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, within the meaning of the CWO, in that, inter alia, defendants provided and transferred funds to Hezbollah.

174.    Defendants acted negligently in connection with the decedents and the plaintiffs, toward whom, in the circumstances described herein, defendants had an obligation not to act as they did. Defendants were obligated not to act as they did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, persons such as the decedents and the plaintiffs were liable to be harmed by the acts of defendants described herein.

175.    The behavior of defendants constitutes Negligence under the CWO, and that negligent behavior was the proximate cause of the decedent's and the plaintiffs' harm, which includes: death; conscious pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

176.    Defendants are therefore liable for the full amount of the compensatory damages due to the estate of the decedent and to the plaintiffs.

177.    Under Israeli case law a plaintiff harmed by an act of Negligence caused by intentional conduct is entitled to punitive damages.

178.    The conduct of defendants was intentional and malicious, and so warrants an award of punitive damages under Israeli law.

## SIXTH CLAIM FOR RELIEF
## AGAINST ALL DEFENDANTS ON BEHALF OF PLAINTIFFS
## ESTER LELCHOOK, MICHAL LELCHOOK AND YAEL LELCHOOK
## AIDING AND ABETTING
### (Under the Law of the State of Israel)

179.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

180.    Defendants knowingly and intentionally provided Hezbollah with funds which enabled, facilitated, supported and assisted Hezbollah to carry out the Hezbollah Rocket Barrage and the Rocket Attack.

181.    Aiding and Abetting principles are recognized in § 12 of the CWO, which provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

182.    Defendants knowingly and intentionally assisted Hezbollah to carry out the Hezbollah Rocket Barrage and the Rocket Attack and are therefore liable for the full amount of damages due to the estate of the decedent and to the plaintiffs under CWO § 12.

183.    The conduct of defendants was intentional and malicious, and so warrants an award of punitive damages under Israeli law.

## SEVENTH CLAIM FOR RELIEF
## AGAINST ALL DEFENDANTS ON BEHALF OF PLAINTIFFS DORIS AND
## ALEXANDERLELCHOOK
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Under the Law of the State of Massachusetts)

184.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

185.    Defendants' conduct was willful, extreme, outrageous and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency and is utterly intolerable in a civilized community.

186.    Defendants intended to, and did in fact, terrorize plaintiffs Doris and Alexander Lelchook, the mother and brother of the decedent, and cause them egregious emotional distress. As a result and by reason of the Hezbollah Rocket Barrage, which was caused by the actions of defendants described herein, plaintiffs Doris and Alexander Lelchook have suffered and will continue to suffer terror, severe mental anguish, bereavement and grief, and injury to their feelings.

187.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages.

188.    The conduct of the defendants was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray that this Court:

(a)    Enter judgment against the defendants, jointly and severally, in favor of the plaintiffs, for compensatory damages in an amount to be determined at trial, but for no less than $300,000,000.00 (three hundred million dollars);

(b)    Enter judgment against the defendants, jointly and severally, in favor of the plaintiffs for punitive damages in amounts to be determined at trial;

(c)    Enter judgment against defendants BSPLC and BSI, jointly and severally, in favor of the plaintiffs for treble damages;

(d)     Enter judgment against the defendants in favor of the plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees; and

(e)     Grant such other and further relief as justice requires.

**JURY DEMAND:     PLAINTIFFS DEMAND A JURY ON ALL ISSUES TRIABLE BY JURY**

Dated:     Brooklyn, New York
           November 2, 2015

                              Yours,

                              THE BERKMAN LAW OFFICE, LLC
                              *Attorneys for the plaintiffs*

                              by:    s/ Marna F. Berkman
                                     Marna F. Berkman
                                     Robert J. Tolchin

                              111 Livingston Street, Suite 1928
                              Brooklyn, New York 11201
                              (718) 855-3627

                              NITSANA DARSHAN-LEITNER & CO.
                              NitsanaDarshan-Leitner
                              *Israeli counsel for the plaintiffs*
                              10 Hata'as Street
                              Ramat Gan, 52512 Israel
                              Israeli #: 011-972-3-7514175
                              U.S. #: 212-591-0073